## Case No. 12,815.

### Ex parte SHOUSE.

[Crabbe, 482;[1] 1 Pa. Law J. 227.]

District Court, E. D. Pennsylvania. July 29, 1842.

BANKRUPTCY — THE PETITION — SUFFICIENCY OF STATEMENT OF DEBT—ACT OF BANKRUPTCY—PREFERENCE—PARTNERSHIP—EVIDENCE.

1. Where petitioning creditors state in their petition simply that there is owing to them, from the alleged bankrupts, the sum of five hundred dollars and upwards, it is a sufficient statement of their debt to enable them to institute proceedings.

2. A note of the alleged bankrupts, passed by them to the party in whose favor it was drawn after it was due, and after the alleged acts of bankruptcy, and subsequently purchased by the petitioning creditor in order to enable him to petition, is a sufficient debt for that purpose.

3. A dissolution of partnership, and consequent transfer from the retiring to the remaining partner of all the assets and liabilities of the firm, is not necessarily an act of bankruptcy in the partnership, but may be so if it is intended thereby to give a preference to a separate creditor over the creditors of the partnership, or to bring him in on an equality with them, which could not have been if the partnership had continued, or, generally, if it is in any other way a cover to actual or legal fraud.

[Cited in Darby v. Boatman's Sav. Inst., Case No. 3,571; Re Waite, Id. 17,044; Re Johnson, Id. 7,369; Tiffany v. Boatman's Sav. Inst., 18 Wall. (85 U. S.) 389.]

4. Where a partnership in involved circumstances called a meeting of their creditors, and on the same day transferred to a particular creditor the note of a third party, as security for an antecedent debt, it was a fraudulent preference and an act of bankruptcy.

5. Otherwise, if the collateral security is transferred when the debt is incurred.

6. Evidence of acts of bankruptcy must be confined to those alleged in the petition.

This was a petition by certain creditors of the firm of J. A. and H. W. Shouse to have that firm declared bankrupt. It appeared that the respondents were partners in the dry goods and hosiery trade in Philadelphia. On the 1st April, 1842, Henry W. Shouse retired from the firm and assigned his whole share therein to the other partner, Jacob A. Shouse, who also assumed the debts of the partnership, the arrangement being altogether verbal; Henry W. Shouse, however, subsequently remained about the store and acted as one having an interest in the business. Prior to the formation of the firm, Jacob A. Shouse was indebted to his father William Shouse in $6000, exclusive of interest, secured by bond and warrant of attorney, and also to Dickinson and Brother in $4000, being his proportion of the debts of an extinct firm of which he had been a member, and for which sum they held his note. After the dissolution Jacob A. Shouse carried on the business and paid some of the debts of the firm, though just before the dissolution he had confessed their inability to pay a very small bill which was then presented. On the 2d

May, 1842, a meeting of the creditors was called, at which Henry W. Shouse acted as if still a partner, and for which, indeed, he had written the call. At this meeting it was ascertained that the firm was insolvent, exclusive of the individual debts of the partners, but no arrangement was effected with the creditors, and thereupon these proceedings were commenced, the petition being filed on the 5th of May.

[2][On the 5th May, 1842, Carr & Hall, and Meckie, Plate & Co. filed a petition for a decree of bankruptcy against Jacob A. Shouse and Henry W. Shouse, brothers, and then lately partners in trade. The petition was in the form prescribed by the rules of court, and set forth that the Shouses were owing to the petitioners, "the sum of $500 and upwards," and that they had become bankrupt, by—(1) Having on the first of April preceding, fraudulently dissolved the firm, and by Henry's having transferred all his interest in the firm, then being insolvent, to Jacob, to enable one William Shouse (the father of the said Henry and Jacob) to enforce against the said assets, a separate debt (which was specified—a judgment in D. S. B., ripe for execution) of $6000, due by Jacob to his father; and also to enable Jacob to pay "a certain other separate creditor of him the said Jacob to a large amount, in whole or in part out of the said assets, to the injury of (your) petitioners, and all creditors of the said firm." (2) By the said Henry and Jacob, or the said Jacob, "with the knowledge and consent of the said Henry" having "made fraudulent transfers of evidence of debt, to prefer divers of the creditors of said firm, to wit, one Hulse, to secure a debt of $149 96, and one Jacob Shouse (a third brother), to secure a debt of $100." (3) That the said firm had become, and was now insolvent.

[The answer denied the facts as charged, and that any act of bankruptcy had been committed, but did not except to the petition for want of precision or form.

[When the case came on to be heard, it appeared, that Carr & Hall held a note of the respondents for $488 46, which, on the 2d May, 1842 (three days before the petition filed), had been given to one Grundy, for an antecedent debt, and which Carr & Hall had on the same 2d May purchased of Grundy at a discount of 25 per cent. for the purpose of making the present petition. It appeared also, that Carr & Hall held in their own right, a note of the respondents, originally for $250, dated the 23d March, 1842, and payable on demand. This note was, however, secured by an assignment of a note of one Healy for $276 67, which would not be due till the 8th–11th June, 1842, and for which note C. & H. had given a receipt, thus, "Received, &c. &c. Healy's note, six months from

[2] [From 1 Pa. Law J. 227, and here published in place of the more condensed statement of facts and briefs of counsel contained in Crabbe, 482.]

December 8th, as collateral security;" and besides this, the original note had been reduced by two payments on account, one of $24, on the 1st of April, and another, of $50 on the 7th of April. Its amount, when the petition was filed, was accordingly $176. Meckie, Plate & Co. held two notes, one for $373 47 which was over due at the time the petition was filed, (this note fell due April 26th;) and another for $270 50, which would not be due until more than a month afterwards. Jacob, at the time he entered into the partnership with his brother, owed their father $6000, (the debt alleged in the petition;) and also $4000 to an old partnership, of which he had been formerly a member. Henry owed nothing except the partnership debts. Neither had property except what was invested in the partnership.

[As to the first allegation of the petition, (viz. the fraudulent dissolution and transfer) it appeared by evidence whose competence was not objected to, that the respondents dissolved their partnership connexion on the 1st April, 1842, Henry retiring from the business, but not executing any transfer; the arrangements (which did not appear to be very definite) resting in parol. Henry, however, remained, usually about the store, and appeared to take part in attending to its management. Jacob took the assets, and carried on the business, and between the 1st of April, when the partnership was dissolved, and the 2d of May, when (as is hereafter stated,) the creditors were convened, sold some of the goods, and paid some of the debts. but these debts were less in amount than the proceeds of the goods sold. The concern, was, however, considerably embarrassed, and on the 2d of May, a meeting of the creditors was requested, and held on that evening. An invitation, which was produced, to this meeting was in the handwriting of Henry. On the following evening a committee, which had been appointed the night before, to examine the affairs of the partnership, reported to the creditors that the liabilities were $17,450 90 and the assets $16,692 28, leaving a deficit of $758 68. In consequence of the mode of bookkeeping which had been used by the respondents, the state of the firm on the 1st of April, when it was dissolved, did not satisfactorily appear. A book-keeper employed by the petitioners, to investigate the books, testified that the firm was more insolvent on that day than on the 2d of May when they called their creditors together. But the respondents produced another book-keeper, who, on different data, made a different statement. It appeared, however, from M'Henry's evidence, (which as is hereafter stated, was objected to, as incompetent,) that towards the end of March,—a few days before the partnership was dissolved, he, M'Henry, called on the firm for payment of a small bill, which the firm could not, or did not pay. From other evidence, (the note book of the respondents, which was not however filed with the deposi-

tions in the case. After the hearing, it was mislaid by the counsel of one party or the other; and the reporter has, in vain, endeavored to procure it. He cannot, accordingly, give its contents with any nearer precision than he has done;) it appeared that on the 8th of April, a note for $500 fell due, of which but $150 was paid; that on the 20th several other notes matured, on which likewise, but partial payments were made. On the 26th, Meckie, Plate & Co.'s note on which this petition was in part founded, became payable. On the 29th Jacob wrote to his brother John, (as is hereafter stated,) asking him to make a loan of money; and on the 30th was greatly pressed to raise the sum of $100, to replace money of a friend, which a few days before he had misappropriated. The best proposition made at the meeting, was to deduct from the partnership assets the $6000, due the father, and to bring in the $4000 due the old firm into the common stock with the partnership creditors, and then to give the creditors all round 40 p. c. in endorsed notes, having 4, 6, 8, 10, 12, 14, 16, and 18, months to run, with 5 p. c. in the firm's own notes at 20 months. The other evidence of insolvency and fraud, rested on admissions said to have been made by Jacob A. Shouse, at the two meetings of the creditors already mentioned. Henry attended these meetings, and heard all that was said, and made no objection or correction, but did not himself take an active part.

[Cavender, a witness of the petitioners, testified that Jacob was asked by one of the creditors, "Did you now know that you were insolvent at the time of the dissolution?" and that he answered "Yes;" but whether Jacob answered "I did," or "We did," the witness could not say. This witness did not remember hearing any cause assigned for the dissolution of the firm. Greiss, a witness of the respondents, swore that the answer was, "I knew I was." John Shouse, (a third brother, whose testimony was not objected to,) to the same point; and, that in immediate connexion, Jacob proceeded to speak of the debt due to his father, and the old firm. These last two witnesses, and M'Carraher, (a witness of the petitioners) heard no other cause assigned for the dissolution of the firm, than that Henry was not in good health, and wished to retire from the city. But M'Carraher stated, that Jacob, at one of the meetings, had said that Henry was well aware of the condition of the firm, and, notwithstanding his retirement, that he knew he would be liable for the debts of the firm. This witness stated also, that at one of these meetings, when Jacob was urging a compromise by which the $10,000 due to him individually should be satisfied, as before stated, out of the partnership assets, and the subject of conversation leading to it, John Shouse (a lawyer of Easton, and who represented his father) produced his father's bond, and said that he could take out of the partnership stock the entire amount of the bond. With regard to this bond, it appeared that on the 29th April, 1842, John Shouse, having received a letter from Jacob, asking the advance of money, came to Philadelphia, and, in behalf of his father, who likewise resided at Easton, entered judgment on the bond, in this city. But all this part of the case was made much stronger for the petitioners, by the evidence of Freytag and of M'Henry; but their competency was objected to, before the commissioner, and on the hearing, upon the following grounds: Freytag, was a member of a certain firm who at the time of filing the petition, and still, were creditors of the respondents. To give himself competency, he produced an assignment by himself to another member of his firm, just before the testimony was taken, (June 3d,) and a release by the assignee, "from all, and all manner of liability or responsibility on account of the transfer." Freytag in his evidence stated that his firm was solvent. M'Henry, like Freytag, belonged to a firm which, up to the day the testimony was taken, had been a creditor of the respondents; but on that day the firm, (itself composed of two brothers) had assigned the claim (to their father,) at 25 p. c., in a note of this father, payable on demand. (M'Henry and Freytag, with another creditor, one of the petitioners, were the committee which had been appointed, as before stated, on the 2d May; and they had, accordingly, in a good measure, taken the lead, and been deferred to.) Both these persons, then, stated, that the answer of Jacob Shouse, to the question already mentioned, was, "We were aware." Freytag, however, stated, that he heard no cause assigned for the dissolution of the firm, but Henry's being tired of business, and desiring to remove into the country. But M'Henry stated, that in answer to a question put, or a statement taxed upon Jacob, Jacob had answered that he had dissolved with his brother, for the purpose of enabling his father's judgment to hold good against the stock; that himself suggested, and in fact positively asked Henry to have a receiver appointed, which Henry declined to do, in consequence of his desire to save his father the $6000; and finally that John Shouse said, that if the creditors did not come into an arrangement, the father would proceed to sell under his judgment. (But John Shouse swore positively, that "nothing of the kind," stated by M'Henry as having been admitted to be the cause of the dissolution, was said at the meeting referred to.)

[As to the second allegation,—the preferences. 1st, Hulse's. On the 2d May, (the day on which the creditors were convoked,) a note of one Lee, for $130 had been assigned to Hulse, to secure a debt of $149 96, money borrowed on the preceding 27th April. By which of the brothers the money had been borrowed, did not appear, but a note addressed to Hulse, May 2d, 1842, (the day, as

has been stated, on which the creditors were convened,) requesting him to hold Lee's note "as collateral," was written by Jacob, and signed in the firm's name; and the collateral itself was indorsed by Jacob in the same name, and both Freytag and M'Henry stated, that at the meeting of the creditors, Jacob, in Henry's presence and hearing, and unreproved by him, acknowledged the transfer of the collaterals for the debts due to Hulse, and to John Shouse, which, Jacob proceeded to state, the firm wanted to prefer, to pay in full; and M'Henry added, that Jacob said "they didn't wish any one to lose borrowed money, and the bankrupt law prevented them making preferences." 2d. John Shouse's. On the 30th April, Jacob applied to his brother John, for a loan of $100, which he was "extremely anxious" to have, for the purpose of paying a debt of a friend who had sent him $100 to pay it; which money, he, Jacob, being very much in want of, had used, with the expectation of making it good in a few days. John agreed to give him the money, if Jacob would make him secure, which Jacob did, by giving a note of a third person, for $147, as collateral; John giving "a written promise to return him the difference when the note was paid." (John Shouse's testimony.)

[The case was argued at great length, and with much contention as to the credibility of the witnesses.

[Mr. Gerhard for the petitioning creditors. This is an issue, in an equity cause, between the petitioning creditors, as complainants, and the two Shouses, as respondents. There are no other parties to the proceedings. Under the rules of court, the petition and answer elicit one or more issues. In the present case the joint trading of the respondents, and their being debtors to the requisite amounts are not put in issue. The case is narrowed to the discussion of the issues. By evidence not disputed, it appears that the transfer to Jacob was voluntary, without consideration, without any declaration of trust, and was made by one member of an insolvent firm, to his copartner yet more insolvent. The property which before belonged to the partnership, became the individual property of Jacob; it became subject to the father's judgment which had just been made ready for execution; and the whole transaction was out of the ordinary course of business. These facts speak loudly as to the object of Henry's retirement. The purpose of the dissolution appears yet more plainly, in what was said by Jacob, at the meeting of the creditors. It may be objected, that the testimony of M'Henry is not the same with that of the other witnesses. His testimony, however, is positive, and therefore better, than that of the other witnesses. It is a general law of evidence, that positive testimony is to prevail over that which is but negative. One witness may have been attending when oth-

ers were not, may have heard what another did not, may remember what another has forgotten. In this case, the evidence can be reconciled. M'Henry, moreover, was one of the committee, more acquainted with the whole subject than the other creditors were, more interested in what passed, and therefore more to be relied on, when he speaks so unequivocally. M'Henry, Freytag, and McCarraher, all speak as to John Shouse's production of the father's bond. They must be taken to be as intelligent as the witnesses who do not support them, and being more numerous, their testimony, according to a settled rule of evidence, must prevail. M'Henry and Freytag are uncontradicted on all other points. But no mttter what may have been the intent of the dissolution. It was a general assignment by Henry of his property, for he had no general property. Now, a general assignment, it is well settled, is an act of bankruptcy. Compton v. Bedford, 1 W. Bl. 362: because, says Mansfield, it "creates an insolvency"; Law v. Skinner, 2 W. Bl. 996: for, says, De Gray, the trader "can carry on no business"; Alderson v. Temple, 4 Burrows, 2235: because, says Lord Mansfield again, "it would be rescinding the whole system of the bankrupt laws," and having the debtor, instead of the great seal, appoint the trustees. S. p., Ex parte Foord, decided by Lord Hardwicke, cited in 1 Burrows, 477; Thornton v. Hargreaves, 7 East, 544. And see, particularly, Stewart v. Moody, 5 Tyrw. 493, 1 Cromp. M. & R. 777, and Siebert v. Spooner, Tyrw. & G. 1075, 1 Mees. & W. 714, —modern cases, where the subject is regarded as fully settled. This point has been similarly decided, and on similar grounds, by Judge Conkling of the Northern district of New York. Barton v. Tower [Case No. 1,-085]. And he remarks that the provision of our act has been copied nearly verbatim from the act of 5 Geo. IV.

[2d. As to the preferences. First. Hulse's. This preference was unsolicited by Hulse. It was given at the same time that he received notice to attend the meeting of creditors, and was therefore in contemplation of bankruptcy. It is an act of bankruptcy. Harman v. Fishar, Cowp. 117; Ogden v. Jackson, 1 Johns. 370. Pulling v. Tucker, 4 Barn. & Ald. 382. Second. John Shouse's. This money was borrowed for the purpose of enabling the bankrupts to make a preference; and this purpose was known to John Shouse. John Shouse cannot thus enable his brother to do that indirectly, which if done directly, would be a fraud on the law. Nor is it material that the transfer was contemporaneous with the advance. In Linton v. Bartlet, 3 Wils. 47, "a trader, in consideration of a loan of $201 * * * being in insolvent circumstances, assigns one third part of all his effects to the lender, who is his brother." Per Cur.: "Although this may be a hard case upon the brother, who is a bona fide creditor, yet the giving him a preference is

a fraud upon all the laws concerning bankrupts, &c. There is no case wherever such a preference as this was allowed. The same spirit of equality ought to warn the courts of justice which warned the legislature when they made the bankrupt laws, &c. It is a bill of sale made by a trader, when he was insolvent, and plainly had an act of bankruptcy in contemplation, &c. The deed is void." This case is in point.

[3d. The insolvency of the firm; which, as I contend, is made an independent and specific act of bankruptcy under the 14th section of the act. That section declares "that where two or more persons, who are partners in trade become insolvent, an order may be made in the manner provided in this act, either on the petition of such partners, or any one of them, or on the petition of any creditor of the partners." Under the recent English statutes, insolvency is almost synonymous with bankruptcy. It would seem that congress did not wish to extend our bankrupt system so far, but confined insolvency, as an independent act of bankruptcy, to partnerships. In fact, in such cases it is almost essential for the protection of the respective rights of the individual and firm creditors, because the minute provisions contained in the 14th section, secure the proper distribution of the individual and firm assets. The meaning of the words is plain; and if read without attempt at refined criticism, they present no difficulties. On the other hand, any effort to escape from the obvious meaning of the words produces contradictions and absurdities. Either insolvency is, in the case of partnerships, a substantive act of bankruptcy, or it is a superadded requisite to the declaration of partners as bankrupts—a reductio ad absurdum. In addition, it must follow that without the 14th section, partners could not be declared bankrupts—a construction which would be in direct conflict with the whole current of English decisions and those of this country, on the former bankrupt law.

[Mr. J. M. Porter, Mr. Mallery, and Mr. Charles Gilpin, for the respondents, said that the case was defective in its outset. The debt of $500, said to be due to the petitioners, was stated in too general a way. It did not appear to whom the debt was due.—whether to C. & H., or to M. P. & Co., nor did the character of the debt appear. It was impossible for an averment so defective in precision, to be answered. Besides, $500 are not due in the sense required by congress; for, first, C. & H. bought one of their debts, (Grundy's,) for the purpose of instituting this proceeding. They ask to make a law, designed to aid honest creditors, subserve the animosities of malignant ones. The court will not assist in experiments of cruelty. Every act of bankruptcy is supposed in law, to be a fraud upon the petitioning creditors; but how can this be when that person had

no debt existing at the time? He is no party grieved. In Ex parte Lee, 1 P. Wms. 782, the chancellor says, "Had the endorsement, &c. been made after the bankruptcy, it might be a question, whether such indorsee would be entitled to a commission—he not being a creditor, &c., or capable of taking out a commission at the time of the party becoming a bankrupt." Second. The other claim of Carr & Hall, is not enforcible at this time. It is secured by Healy's note, not yet due. It can't be doubted, that it was understood that the note for $250 should not be enforced till it was seen whether Healy's note would be paid. Except forbearance, there was no consideration for the transfer of Healy's note. Payments have been made on account; and every thing shews that it was understood there should be no process. At any event, the note of Healy, should be surrendered. Third. The debt of $270 50, to M. P. & Co., is not yet due. In point of law it is no debt. In the construction of the act of congress, technical words must be construed technically. To "owe" debts not due, is a legal absurdity. Could an action of debt, or assumpsit, or any action be brought on such a debt? Could the plaintiff declare that the defendant, "to him owed, and from him unjustly detained" such a debt. The answer would be "Nil debet." Therefore, the only debt on which the petition can rest is one of $373 47, due Meckie, Plate & Co.; and this debt is insufficient in amount.

[But as to the merits. Freytag and M'Henry are the two principal witnesses of the petitioners. Both are incompetent. Though Freytag assigned his interest in the note, to his co-partner, it is still the property of the firm; so much so at least, as that it is applicable in the first instance, to the payment of partnership debts. His interest in the note, and also in the firm, is that which remains after payment of these debts; and he is interested in obtaining a decree, by which the note will be certainly provided for. Then, as to M'Henry. Can it be believed, that the note given by M'Henry, the father, to the firm, and payable on demand, will be enforced in case nothing is realized from Shouse's note. M'Henry having given his note, is a legal consideration for the transfer, even if never paid. The firm is obviously interested that their father should receive the amount of Shouse's note. The evidence of both Freytag & M'Henry, must, then, be eliminated; and the case then falls down. The dissolution appears to have been fair, and for the purpose of enabling Henry to withdraw from business. Neither William Shouse nor John Shouse, nor any other of Jacob's separate creditors, were informed of the dissolution. There is no evidence, in either case, that any property of the firm was ever offered to these creditors, or ever agreed to be given to them. On the contrary, Henry, notwithstanding ill health, and a desire to withdraw to the country, still remained

supervising the affairs he had left, and seeing that the firm's affairs were properly conducted. Besides, is it credible that Henry, who it appears, well knew of his liability for the firm's debts, should love his brother's creditors so much better than those who were at once both his own and his brother's, as to assign his property to pay that brother's creditors?—this, too, when by so doing, ne would not relieve his brother from debt, but only substitute one class of creditors for another. Admitting that John Shouse said, at the meeting, what Freytag and M'Henry say, that he did. What of it? It was said only pending a negotiation of compromise; and to induce it. Did he ever do what he said he could do? or rather, did Jacob and Henry ever assist him in doing it? for until you so connect the acts or designs of the father or his agent, with those of Henry and Jacob, as to make the acts or designs of the former, the acts and designs of the latter likewise, it is of no importance what John or his father threatened to do, or even what they did. It appears that John Shouse came to town, to enter judgment against the firm, when they, so far from assisting to protect the father, were asking of John, his agent, additional advances. It was an act induced by John's alarm for his father; and so far as adverse relations existed, of an adverse nature of the interests of the firm. It was in invitum. But it is said, that the transfer was an act of bankruptcy, no matter what may have been its object. We admit that according to the English decisions, a general assignment is an act of bankruptcy. But an assignment is a transfer under seal. 2 Bl. Comm. 310. This transaction had none of the qualities, and none of the effects of a general assignment. The right of levy, and every other right of the partnership creditors remained undisturbed by this transaction. It was a mere retirement of Henry from the firm. But besides the English doctrine has not been followed by this court. It is a doctrine which has not proved satisfactory even at home. Eden speaks of it, as a doctrine "difficult to understand" (Eden. Bankr. Law, 28); as one whose reasons "are by no means satisfactory" (Id.). Lord Eldon has more than once expressed his disapprobation of the doctrine. 16 Ves. 148; 17 Ves. 198. It got foot from a N. P. decision of Lord Mansfield (Coke, Bankr. Law, p. 100), whose great name controlled subsequent judges against their own judgment. On principle, it is not easy to understand the doctrine. Such an assignment is good at common law; by the statutes of Elizabeth; and it is not declared by the bankrupt act to be void. Nor is such an assignment against the policy of the act. The policy of the act is, that creditors shall be paid alike; and the act has no further policy. Now a general assignment, without preferences, does exactly this thing. It may not do it in the manner and through the same forms as the bankrupt law would do it; but

the machinery of the act is no part of its policy. The court has no right to extend the policy of the bankrupt act, beyond the point that the bankrupt act has, itself, defined. So inconvenient has the doctrine been found in England, that according to Eden (Bankr. Law, 31), the legislature (Geo. IV. c. 16), has been obliged to ingraft a limitation on the principle.

[Now, as to the preferences. "Fraudulent," as used in the first section of the bankrupt law, means fraudulent, in ordinary signification. It is used without any reference to qualification, by future parts of the act. The assignment must be shown to be fraudulent in fact, or by some principles of law, independently of the bankrupt act. Now neither preference was of this character; for it is lawful for a debtor to prefer a bona fide creditor. Then does the preference come within the 2d section, and become void as being a fraud upon the bankrupt act? To be void on that ground, it must have been made "in contemplation of bankruptcy." We observe, first, that there is not evidence even of insolvency, and this is in answer, likewise to the 3d allegation of the petition. The two book-keepers are in conflict. The committee found the firm, a month after the dissolution, nearly solvent. As to the proposition to pay 45 per cent, it was a proposition, made during a treaty, and under an attempt to make an advantageous compromise. But it was made on an estimate which brought Jacob's separate debts as a charge on the firm's property. It was a proposition which failed, and failed because the partnership creditors refused to agree to it. It was dependent, and to be dependent on their assent. If an execution had issued on the father's bond, the process would have been set aside. If there had been danger of misapplication of the partnership effects, equity would have appointed a receiver. Those effects were fettered by a trust, which nothing could dislodge. The firm was solvent; or, at all events, there was no contemplation of bankruptcy, which is always a question of fact. (The counsel then pursued the same course of argument as Mr. Sergeant did in Potts and Garwood [Case No. 11,344], and as Mr. Mallery did. in Breneman's Case [Id. 1,830]). But the petition makes no allegation of "a contemplation of bankruptcy." According to its own showing the preference may have been valid. The petition should possess the essential qualities of a declaration; and this court has already decided in Potts and Garwood [supra] that it will not hear proof of any thing not alleged in the petition, nor put in issue. This is conclusive as to the preferences. But suppose the petition to be sufficient. Are the preferences acts of bankruptcy? First, the transfer to John Shouse. It was contemporaneous with the money advanced. It was clearly bona fide; and if such a transfer was invalid, so would an ordinary sale have been; for where a party can sell, be can pledge or mortgage likewise. For

aught that appears, the case cited from 3 Wils. 47, was for an antecedent debt. But in addition to this, the whole transaction was with Jacob alone. Second. Hulse's preference. Striking out the evidence of Freytag and M'Henry, there was nothing to shew that Henry was cognizant at any time, of the transfer. The note inclosing the transfer, was written by Jacob alone. It was written after the dissolution of the firm, and when, according to the averment in the petition, the object of Henry was to give Jacob entire control.

[As to the 3d allegation—the insolvency of the firm,—which it is alleged, is ground for a decree under the 14th section of the act. The language of the section is peculiar. "Where," &c., "partners in trade, become insolvent, an order may be made in the manner provided in this act" to secure partnership effects to partnership creditors, and individual property to individual creditors. Now the word "order," though used in both sections 10 and 11, is not used in the sense of a decree of bankruptcy. It is a direction of the court made subsequently to such decree. A decree must precede it. "Insolvency," can mean, therefore, nothing but insolvency as ascertained by a decree of bankruptcy. Any other construction would render the bankrupt act, both impracticable and dangerous;—impracticable, because insolvency is an issue which it would be scarce possible, in many cases, to ascertain: For example, in the case of a firm whose affairs were on a large scale, the court would be involved in investigations as to the condition of debtors on all parts of the earth; and in speculations upon the course of commerce, of politics, and of many other things which in their nature could afford no data for conclusion. The construction would be dangerous, because it would enable a discontented partner, or a malignant enemy, to destroy the most stable commercial house, if largely engaged in trade. If the petitioner can't prove insolvency, he can, at least, produce it. The firm is advertised as among bankrupts. Its creditors make a rush. Its credit is destroyed. Its resources exhausted; and itself is ruined. Yet the way is irremediable. This is the nature of commercial credit. So obvious are these considerations, that of two improbabilities, it is more easy to believe that the word "insolvent," has been inadvertently used for "bankrupt," than that congress should not have perceived the disastrous results which judicial action upon the strict sense of the term "insolvent," would produce. The object of the provision, it may be fairly contended, was nothing more than to regulate in an equitable manner, the distribution of partnership, and individual effects.

[The counsel ended by saying, that the power given to an individual to proceed against merchants who might prove entirely solvent, was one, which, if not strictly regulated, would prove pernicious. Nor was the mischief remediable by discharging the petition. The court ought early to announce its determina-

tion to encourage no proceeding of this sort, unless the petitioner was ready to sustain his allegations,—sustain them—not by questionable evidence, by conjectures, or by inferences, but by clear, direct, and connected testimony. The petitioner came into court, swearing that he was ready to prove his allegations. If the court acted on this principle, it was impossible to award a decree against Henry W. Shouse; and failing in part, the petition would be dismissed.

[It was replied. The respondents do not rely on any merits of their own; their effort is, to invalidate the case of the petitioners. Have they succeeded in this effort? To their first objection,—that the debt of $500 is defectively stated, it is a complete answer, to say, that this court has set forth a form of petition (Rules & Forms Bankr. p. 41), and that the form prescribed is literally adhered to, in this petition. The English form may be more precise, but that is a matter regulated by a rule of the English court of chancery. This court has adopted a different rule. It is contended next, that the respondents do not "owe debts amounting in the whole to not less than $500," to the petitioners. This is a point not raised by the issues. The existence of the debt is averred by the petition, and is not denied by the answer. The court should, therefore, not allow the question to be discussed, for the case of Potts & Garwood [supra] has decided that parties will be confined to the discussion of the issues.

[But let us examine the objection. 1st. As to Grundy's debt, (for $488.46), in regard to which, it is objected that it was bought by the petitioners after the act of bankruptcy was committed, and so not owing. Whatever dicta or decisions may have been formerly made, on this point, the modern law is that the indorsee comes in on the ground of the original debt; and if the petitioner be a creditor when the petition is filed, that is enough. This point was settled in the K. B. in Glaister v. Hewer, 7 Term R. 498. See, also, Bingley v. Mallison, 3 Doug. 333; Anon., 2 Wils. 135, and Key v. Cook, 2 Moore & P. 720.

[2d. As to the debt of $176, secured by Healy's note. It is argued, that for the purpose of this application, the original debt is extinguished by this security: This, however, cannot be, unless there was some contract to forbear; and there is no evidence from which such a contract can, fairly, be inferred. Undoubtedly Carr & Hall could have sued the respondents at law—there being no stronger evidence of contract to forbear. In Hill v. Harris, 1 Moody & M. 448, a stronger case than this, Lord Tenterden held, that where money was lent on a mortgage payable after six months' notice, such notice not to expire before the 30th January, 1830, a commission was properly sued out on the debt, in March, 1829. See also, Culver v. Calender [Case No. 3,467].

[3d. As to the debt of $270.50 to Meckie,

Plate & Co., to which it is objected that it is not yet due. The answer is, that the act don't require that the debt should be due. The act requires only, that the respondents should owe debts; and as is remarked by Judge Conklin (Barton v. Tower [Case No. 1,085]), the phraseology of the act in relation to the debt of not less than $500 to the petitioning creditors, is the same in this respect as that used in relation to the aggregate amount of debts which the debtor must owe, of not less than $2,000, and it will not be pretended that these debts must be actually due.

[The object of the provisions in regard to each requirement as to the amount of the debt was to prevent insignificant creditors, from occupying the time of the national courts with their petty litigations. The "debitum in præsenti solvendum in futuro," is well known to the law; and the case of Hill v. Harris, 1 Moody & M. 448, already cited, shows that the petitioning creditors' debt need not be due.

[Respecting the competency of M'Henry and Freytag. If incompetent in the first instance, their assignments and the release have divested them of all legal interest in the matter. Willings v. Consequa [Case No. 17,767]; Sinclair v. Stevenson, 1 Car. & P. 582. "Curia advisari vult."] [3]

RANDALL, District Judge. Several exceptions have been taken, by the counsel for the respondents, to the regularity of the proceedings in this case, which it may be well to consider before entering into any examination of the merits of the application, for, if well founded, they must put a stop to the present proceedings. It is said the petition is informal, inasmuch as it does not state the nature and character of the petitioning creditors' debt. This, however, I apprehend to be wholly unnecessary. It sets forth that the respondents owe them five hundred dollars and upwards; this is all which is required either by the act of congress or the rules of court; indeed, the form of petition prescribed by the court, has been literally followed by the petitioners, and is sufficient to institute the proceedings, although it may not be sufficient to entitle them to a dividend of the assets. The same general allegation of indebtedness was made under the bankrupt law of 1800 [2 Stat. 19] (Coop. Bankr. Law, Append. vii.), and in England no other particulars are required. Ex parte Ward, 1 Atk. 153.

It is next said that the debts of the petitioning creditors were not due at the time of presenting their petition, and therefore it cannot be prosecuted. Without deciding whether it is or is not necessary that the debt should be due at the time of presenting the petition (which I strongly incline to doubt), it is sufficient to say that in this case the question does not arise. It is admitted that there was due to Meckie, Plate & Company, one firm of the petitioners, $373 47, being the amount of

a promissory note drawn by the respondents, and which fell due on the 26th April, 1842; and that Carr & Hall were the owners of a note drawn by the respondents in favor of Edmund Grundy, dated the 5th October, 1841, at six months, for $488 46. But this last note, it is said, was not given by the respondents until the 2d or 3d of May, 1842, and was then purchased by Carr & Hall from Grundy; that this being after the acts of bankruptcy complained of, the amount cannot be computed in Carr & Hall's claim; and that a creditor will not be permitted to purchase claims against a debtor, and thus enable himself to obtain a commission of bankruptcy. To this I cannot agree. The act of congress declares that the application shall be "upon the petition of one or more of their (the bankrupt's) creditors, to whom they owe debts amounting in the whole to not less than five hundred dollars." The object of this was, no doubt, to prevent frivolous and vexatious applications by creditors holding trifling demands, and when perhaps the expense of the proceeding might equal the debt to the creditor. All, however, that is required by the act is, that the petitioners should be creditors to the amount of five hundred dollars at the time of presenting their petition. Now it is admitted that the debt was justly due and owing to Grundy, and it is proved that the note was given to him to enable him to sell it to Carr & Hall; by the purchase they became the creditors in place of Grundy, and were as much entitled to join in this application, as he would have been before the sale of the note. Glaister v. Hewer, 7 Term R. 498; Ex parte Lee, 1 P. Wms. 782. There was also a debt of $176 due to Carr & Hall for money loaned by them to the respondents, and as collateral security therefor they held a note drawn by one Healy, not yet due. The respondents, however, had also given their own note for the amount, payable on demand, and suit could have been maintained thereon at once; for though Healy's note was not yet due, it had not been received as a payment, but as a pledge or security, to be surrendered when payment was made. Thus the amount due and owing to the petitioning creditors, on the 5th May, when the petition was filed, amounted to upwards of $1000, and the debts actually due by the respondents to more than $2500.

The exceptions to form being thus disposed of, let us examine what are the acts of bankruptcy complained of, and how they are supported by the evidence. The petition charges that the respondents became bankrupt on or about the 1st of April last: By a fraudulent dissolution of their partnership and transfer of all the interest of Henry Shouse in the assets of the firm, they being insolvent, for the purpose of enabling one William Shouse to enforce against the assets a separate debt of Jacob A. Shouse to the said William Shouse to the amount of $6000, bearing interest, under a judgment bond executed the

[3] [From 1 Pa. Law J. 227.]

15th January, 1833, before the formation of the partnership; and also to enable him, the said Jacob A. Shouse, to pay a certain other separate debt of his, the said Jacob's, to a large amount, in whole or part out of the assets of the said partnership, to the injury of the petitioners and the other creditors of the firm; and by the said Jacob and Henry, or Jacob with the knowledge and consent of Henry, having made fraudulent transfers of evidences of debt to prefer divers creditors of the firm; to·wit: to Charles Hulse, to secure a debt of $149 96, and to John Shouse, to secure a debt of $100. The answer of the respondents distinctly and unequivocally denies each of the allegations in the petition, and that any act of bankruptcy has been committed. From the evidence reported by the commissioner, it appears that the respondents entered into copartnership, in the dry goods and hosiery business, about the 1st August, 1840, and continued until the 1st April, 1842, when the partnership was dissolved by a verbal agreement, Henry W. Shouse retiring from the business, which was continued by Jacob, who took the assets and assumed the debts of the firm; he continued in business until the 2d May, 1842, and during that time, sold goods to the amount of $2473 19, and paid debts of the firm amounting to about $1800; he also purchased goods on his individual account to the amount of $506 67. Prior to entering into copartnership with his brother, Jacob was indebted to his father, William Shouse, who resided in Easton, Pennsylvania, in the sum of $6000, for money borrowed in 1833, for which his father held his bond and warrant of attorney to confess judgment, and was also indebted to the firm of Shouse, Dickinson, and Company, of which he had been a member, in the sum of $4000, for which they held his notes. On the 2d of May, 1842, the respondents called a meeting of the creditors of the firm, and stated their inability to pay their debts. A committee of creditors was appointed to examine into their affairs, and on the 3d, reported that the liabilities of the firm amounted to $17,450 96, and their assets to $16,692 28, showing a deficiency of $758 68. They also reported that Jacob A. Shouse was indebted to Dickinson and Brother in $4000, for his proportion of the debt of Shouse, Dickinson & Company, and to his father in $6000, on the bond before mentioned, but they did not consider it just or proper that either of these debts should be paid out of the assets of the firm. The respondents, however, insisted that the debt to their father should be first paid in full, and Dickinson and Brother be allowed to come in, pro rata, with the other creditors; or they proposed to pay forty per cent. on the amount of the claims in eight equal instalments at four, six, eight, ten, twelve, fourteen, sixteen, and eighteen months, in notes to be endorsed by William Shouse, and the further sum of five per cent. in their own notes, without endorsers, at twenty months. The

committee recommended that this proposition be declined. At both of the meetings William Shouse was represented by his son John, who had the bond in his possession, and, on the 3d May, entered judgment thereon in the district court for the city and county of Philadelphia. The creditors declined acceding to the proposition of the respondents, and this petition was filed on the 5th of May.

It has been insisted by the counsel for the petitioning creditors that the dissolution of copartnership, and assignment by Henry to Jacob of all the property of the former in the firm, was, in itself, an act of bankruptcy, as it assigned all his property, he having no separate estate. To recognise this doctrine would be most disastrous to the business community. A member of a commercial firm could not retire from it, no matter with what motive, without making himself liable to a commission of bankruptcy, and his copartners subject to the contingency of having their business broken up and destroyed when they were in a flourishing condition. Such a dissolution cannot be considered as necessarily, in itself, an act of bankruptcy in any of the copartners; there is no intrinsic evidence of fraud on the face of it, and unless accompanied by fraudulent acts or intentions it is perfectly legitimate. But if the dissolution is a mere cover to conceal either actual or legal fraud, or with intent to give a preference to a separate creditor over those of the partnership, or to bring him in on an equality with them in the distribution of the assets of the firm, which could not have been if the partnership had continued, then there is such a fraud on the partnership creditors as will make it an act of bankruptcy; for it matters not what may be the mode of conveyance, if the intent is fraudulent courts will guard against any evasion of the law. The intent then with which the dissolution was agreed upon being the material point for consideration in this first charge, it is necessary to examine more minutely the details of the evidence as to the acts and doings of the parties, at and about the time it took place, and, as this is more a question of fact than of law, I would be glad if I could at once refer it to a jury for determination, but as the act of congress has imposed on me the duty of deciding it in the first instance, I will do so according to the view 1 have taken of the evidence.

Much has been said as to the credibility of witnesses as well as in regard to their competency. I conceive it to be the duty of a judge, as of a jury, where there is a conflict of testimony to give such a construction to it as will, if practicable, reconcile the whole, or, if that cannot be done, to give more weight to direct and positive than to negative testimony, but if the evidence be uncontradicted, and not improbable in itself, that full faith should be given

to it by the court. With this view I have carefully examined the testimony exhibited to me, and am of opinion that the weight of it is in favor of the petitioning creditors. In coming to this conclusion I have less difficulty, as it is not obligatory on the respondents, who have the right of appealing to a jury to determine the correctness of my decision, while a contrary course would be binding upon the petitioners. As the case will, without doubt, go to a jury, I will not enter into any detailed argument on the facts, but briefly state the principal grounds on which my conclusion is formed. The business of J. A. and H. W. Shouse does not appear to have been very prosperous. A short time before the dissolution of the copartnership Mr. M'Henry called on them for the payment of a small bill: Jacob said they were unable to pay it; that he was sick of the business and had made up his mind to quit it; that he then owed $10,000 in his individual capacity and had no property but his interest in the partnership concern. There is no evidence that Henry in his individual capacity owed a dollar. Six thousand dollars of Jacob's individual debt was owing to their father, who could have no claim on the property of the firm till the partnership debts were paid. Under these circumstances they dissolved partnership on the 1st April, and the property of the firm was assigned to Jacob. It is true some payments were made by him on account of the debts of the firm, but not equal to the amount of sales. As early as the 8th April a note for $500 became due, of which only $150 was paid, and on several other notes which fell due before the 20th of that month only partial payments were made; on the 26th, the note for $373 47, held by Meckie, Plate & Company, fell due, and no part of it was paid.

It is evident that the firm was in difficulties at the time of the dissolution, but it is said that this step had been contemplated for some time, and that Henry, in consequence of ill health, wished to remove to the country. The evidence is, however, that, notwithstanding the dissolution, Henry remained in town, continued about the store, and actually wrote the notices for the meeting of creditors on the 2d of May; at that meeting he took an active part, and when requested by one of the creditors to agree to the appointment of a receiver, acknowledged his authority to do so, but declined, and expressed his desire that the bond to his father should be paid. It is unnecessary at this time to enter into the various declarations made by the parties at the meeting of creditors, and about which contradictory testimony has been given; or to decide how far the acts and declarations of one partner may be given in evidence against the other. I consider the act of dissolution and transferring the joint property to Jacob as the act of both partners,

and altogether different from the case of an individual transferring his property to a third person, which, of course, could not be considered an act of bankruptcy in the grantee. The preference of Hulse I also consider as the act of both parties, being given by Jacob and approved by Henry. The money was borrowed on the 27th of April, and on the 2d May, the very day on which the first meeting of creditors was held, the preference was given, and, for aught that appears, was unsolicited. That they then contemplated bankruptcy can scarcely be denied. It is true this preference was for money borrowed, and was not of very large amount; but, it matters not how meritorious the creditor or hard the case, the law considers all creditors as on an equal footing, and prohibits favor to any. The alleged preference to John Shouse strikes me differently. The security or preference was given at the same time the money was borrowed; it was not for a bygone or prior contracted debt; and it was surely competent for them to give the security on receiving the money. Nor is it any answer to say that the money was borrowed for the purpose of paying another creditor who was thereby preferred; the allegation in the petition is that the preference was given to John Shouse, and that is the only charge the respondents are called upon to answer.

Believing, however, that the petitioners have sustained their first and second charges, the decree prayed for is granted.